PHOENIX INS. CO. OF HARTFORD *v.* CAMILLE BOURGEOIS.

[63 South. 212.]

1. INSURANCE. *Conditions. Keeping books of account.*

Where a fire insurance policy contained what is known as the iron safe clause providing that "the assured will keep a set of books, which shall clearly and plainly present a complete record of business transacted, including all purchases, sales, and shipments, both for cash and credit, from date of inventory as provided for in first section of this clause, and during the continuance of this policy," in case of loss by fire the insured cannot recover, where his books contained no entries for part of the invoices for certain purchases of merchandise, nor for payments of freight and did not show the amount in cash received from cash sales nor the amount collected on credit sales and there was no record of the groceries and other merchandise taken for the support of insured's family or to maintain his horse and delivery wagon and his cashbook was kept in pencil, and contained erasures and alterations, some of which were made after the fire, since his loss could not be arrived at with any degree of certainty from his books.

2. SAME.

While such iron safe clause will not be literally or technically construed still the books must be so kept as that it can be ascertained from them with reasonable certainty, the actual amount of loss by the fire.

APPEAL from the circuit court of Hancock county.
HON. J. I. BALLENGER, Special Judge.

Suit by Camille Bourgeois against the Phoenix Insurance Company of Hartford. From a judgment for plaintiff, defendant appeals.

The facts are fully stated in the opinion of the court.

*McLaurin, Armistead & Brien,* for appellant.

The iron safe clause is set forth on record, pages 20 and 21 of the policy. The supreme court of Mississippi

has construed this clause directly in two cases: In *Aetna Ins. Co.* v. *Mount,* 90 Miss. 642. On page 664 in that case the court said that·the reasonable enforcement of the iron safe clause in insurance policies has been universally upheld by the courts. Indeed, to prevent fraud, and for the protection of the rights of the Insurance Company, some such clause seems necessary. This court has construed the iron safe clause again in the case of *Phoenix Ins. Co.* v. *Dorsey,* decided June 17, 1912, 58 So. 778, wherein the court held, that the iron safe clause was a warranty, and that the loss could not be proven by any other evidence than the books and inventories that were required to be kept by this iron safe clause; that no mere proof of there being some merchandise or a large stock of merchandise *in situ* at the time of the fire, can be substituted for an inventory; that the only evidence competent to prove any loss for which the company is liable, even though it be conceded that the property described in the policy was destroyed by fire was the books and inventories called for in the iron safe clause. This being the settled law of Mississippi, the next question presented is, whether or not the iron safe clause has been complied with in the policy sued on. We respectfully submit that it has not, in any respect. The second paragraph in the iron safe clause required the assured, Bourgeois in this case, to keep a set of books which shall clearly and plainly present a complete record of business transacted, including all purchases, sales and shipments, both for cash and credit, from the date of inventory, as provided for in the first section of this clause and during the continuance of this policy. The concluding part of the iron safe clause is, that upon failure to produce such set of books and inventories for the inspection of the company, this policy shall become null and void, and such failure shall constitute a perpetual bar to any recovery thereon. The set of books offered in evidence in this case proved beyond controversy that this appellee, Bourgeois, was carrying

on a cash and credit business. This record shows that he carried a general stock of merchandise including groceries, dry goods, boots, and shoes, hardware, queensware, some furniture, and those things incident to a general stock of merchandise.

He kept no cash account or record of his cash sales except the original sheets sent up to the court with this record, which are the pages taken from his cash book, showing his cash sales, and directed to be sent up to the supreme court for the inspection of the supreme court, the court being of the opinion that it is necessary, for the ends of justice, that the supreme court shall see the original pages of said ledger kept by the appellee, Bourgeois, as part of the record in this case on appeal.

In addition to this, the books of appellee do not show what was taken out of this store for the support and maintenance of himself, wife and ten children for eight and one-half months either in cash or food and clothing. The stock, necessarily, must have been diminished to that extent and yet there is no entry made of it. This is testified to by Bourgeois. He testifies on this page that he had a family, a wife and ten children; that he got his supplies and supported his family out of his store; that he made no entry for himself and family, or for any little cash items that he may have used, and his failure to do so was another violation of the iron safe clause.

The court will see from this testimony of Bourgeois, when the second time on the witness stand, after he had heard the testimony of his accountant, Fowler, that he was undertaking to escape a violation of the iron safe clause, in that he kept no separate record of his credit sales or cash collections on credit sales, which the iron safe clause required him to keep in paragraph two of the clause, where he was obligated to keep a set of books which shall clearly and plainly present a complete record of business transacted, including all purchases, sales and shipments, both for cash and credit; and in his effort to

escape a violation of this provision of the iron safe clause he undertakes to hide his mischief in the cash register by saying that he would ring up the cash register and put in his register the cash collections on credit sales, which would include his cash sales and his cash collections on credit sales. That when he took money out of the cash register he always put a slip for money taken out of the register. This behavior has been expressly condemned by the courts as not being a compliance with the iron safe clause. In 2 Cooley's Briefs on Insurance, page 1824 the court will see that it has been held, that the requirement of the iron safe clause is not complied with by the preservation of slips from a cash register. Citing *Mounger & Henry* v. *Delaware Ins. Co.* (Tex. Sup. Ct.), 79 S. W. 7, affirming Tex. Civ. App., 74 S. W. 792.

The clause is not complied with where the only record of cash sales kept is a cashbook in which no detailed transactions are recorded, and only the aggregate amount of cash derived from "all" sources is set down at the end of the day. *Everett-Ridley-Ragan Company* v. *Traders Ins. Co.* (Ga.), 48 S. E. 918.

From these authorities the court will see that if Bourgeois did the very things that he testifies he did, and that was that the amount of cash sales, appearing on the original sheets before the court, include not only the cash sales but the cash collections on credit sales which he rang up in his register, it was a clear violation of the iron safe clause, in that he kept no complete record of his business transacted, including purchases, sales and shipments, for cash and credit, as provided by paragraph two of the iron safe clause. This, necessarily, must be the law because the insurance company have no way in the world by which they could verify the correctness of any man's books if by his testimony he could account for what he had personally taken out of the stock. Suppose, if the court please, that Mr. Bourgeois had pocketed the cash collections on the credit sales, as shown by this rec-

·ord, and made no entry of it whatever on his books; this would be a clear fraud and unquestionably a violation of his policy, which would prevent him from recovering.

The supreme court of Mississippi, in *Phoenix* v. *Dorsey,* 58 So. 778, has expressly held, that the books are the only evidence competent to prove the loss. Now, if the books do not show what became of the cash collections on credit sales, when the books do show that two thousand one hundred and eighty-four dollars and seven cents had been collected, his policy necessarily is avoided, under the iron safe clause.

We respectfully submit that it is not competent to put the plaintiff on the stand when this fact is developed by his own accountant, and have him testify (to save his case) that he put the cash collections on credit sales in his cash register and rang it up as cash, because if this contention could be entertained for a moment, it is in express violation of the holding in *Phoenix Ins. Co.* v. *Dorsey, supra.* It would be a dangerous rule, we respectfully submit, to say that when a man's set of books do not show what sales have been made out of his stock, that the whole case can rest in the mouth of the plaintiff, the assured, and let him swear the insurance company into a liability, when the evidence agreed on, to wit, the books, do not show it, a most monstrous fraud could be committed at any time, because it would then lie in the mouth of the assured, the policyholder, to swear to a state of facts to create liability against the insurance company, and this the courts have uniformly held, is not the law.

By reference to 2 Cooley's Briefs on Insurance, page 1825 the court will see the rule laid down as follows: "The books must show, with reasonable certainty, a complete record of the assured's business transactions, including purchases and sales for cash and credit." Citing *Phoenix Ins. Co.* v. *Padgitt,* 42 S. W. 800.

"If they do not show these facts so as to furnish the data necessary to enable the insurers to test the accuracy

of the accounts delivered to them or afford any satisfactory idea of the amount of goods on hand and destroyed by the fire, the insured cannot recover." *Pelican Ins. Co.* v. *Wilkerson,* 53 Ark. 353, 13 S. W. 1103.

"Cash transactions must be distinguished from credit," says a writer. Here the effort to escape a violation of the iron safe clause is to say that the cash and credit transactions were commingled, and there is no power on the part of the insurance company to test the accuracy of it. It lies solely in the mouth of the assured, by which he undertakes to establish his own case.

We therefore respectfully submit, that there was a clear violation of the iron safe clause by the testimony of Bourgeois himself, and by the testimony of his hired accountant, Mr. Fowler.

*Bowers & Griffith* and *W. J. Gex,* for appellee.

We submit that it is apparent that Fowler had everything that was necessary from the books in which to make a proper account. In the first place, he had the inventory of the goods that formed the basis of this stock, taken in January. To that, he added all the goods which had been purchased by Bourgeois which he not only gathered from Bourgeois' invoice book, but which he verified by an itemized account from each merchant from whom Bourgeois had dealt. This gave him the entire amount of stock which Bourgeois had purchased, and to ascertain the value thereof, since most of the goods had been purchased in New Orleans, there were added to those goods purchased in New Orleans, five per cent to cover the freight, which was found to be the correct amount. To ascertain what had been sold out of that stock, the credit sales unpaid for appeared in Bourgeois book, charged to each party who owed him, all of which was properly itemized, then the book of cash sales showed every nickel collected when the goods were delivered, or when a credit customer paid the amount of his credit

purchases on account thereof. We are unable to see where it would make any difference in reaching the results desired whether Bourgeois kept a separate book in which he entered the payments on account of credit sales, but if this question was important, the evidence of this fact is not lacking, because by deducting from the total amount in the register each day the amount as appears credited on the same day to credit customers, it would be very easy to ascertain just what went into the register each day as cash sales, and what represented payment on credit sales.

As to the methods of keeping his books, we submit, as shown by Fowler's testimony, that Bourgeois kept books just about as eighty per cent of the country merchants keep them, and we submit that that manner of keeping books complied with the iron safe clause. That clause was never intended to permit the insurance company to dictate to the assured just what system of books he should keep, so a fair accounting can be made therefrom, and we submit that from the books that Bourgeois kept, not only a fair but also a correct accounting could be made.

In *Western Assurance Company of Toronto* v. *McGlethery* (Ala.), 22 So. 104, it is said: ''Where the insurer pleads that the insured had not kept a set of books and complete record of the business transacted, including purchases and sales, a replication that the condition has been substantially complied with, and that plaintiff had kept books from which the loss could have been ascertained is sufficient.'' See, also, *Manlin* v. *Mercantile Town Mut. Ins. Co.,* 105 Mo. App. 625, 80 S. W. 56. See, also, *First National Bank* v. *Cleland,* 82 S. W. 337.

It makes no difference that Bourgeois had no separate book in which he should have kept the payments on credit sales, because by the system he kept, and the system which as the testimony shows is used by eighty per cent of country merchants, he reached the same results.

Your honors can ascertain from the books before you just what sales were paid for cash, and how much was collected on credit sales from day to day, because Bourgeois struck in the register of cash sales every sale he made for which cash was paid and in addition to that, whenever a customer paid cash on a credit sale, or that is, paid cash on account, he first entered it to the customer's credit, under the customer's account, with the date of payment in a book kept for that purpose, and then struck the amount in the register as cash, so that it is easy to ascertain from day to day just what cash was taken over the counter at the time of the delivery of the goods, and what cash was taken in and from whom on credit sales. Fowler testified that he could tell from the books that the cash taken out of the register each day did not only represent goods collected for at date of delivery, but represented other cash and from an inspection of the books and after talking with Bourgeois, he ascertained just what was done with the cash on credit sales, and whether Bourgeois was telling the truth about that or not (a matter which has already been settled by the jury) it was easy to have ascertained, because on the very day the money in the cash register showed a comparatively large amount, on that day correspondingly large amounts were credited in the credit book, on former credit sales, which were then entered in the cash register. We discuss this proposition at such length, because counsel for the appellant put most of their argument on the proposition that there was no separate account kept of the cash sales and collections on credit sales. We submit that in substance there was such an account kept, that even if there were not, it would make no difference. *Liverpool & London & Globe Ins. Co.* v. *Kearney,* 180 U. S. 132; *American Cent. Ins. Co.* v. *Ware,* 48 S. W. ——; *Meyers* v. *Ins. Co.* (N. A.), 73 Mo. App. 166; see, also, to same effect *Burnett* v. *Am. Cent. Ins. Co.,* 60 Mo. App. 343. See, also, *Prudential Fire Ins.*

*Co.* v. *Alley,* 51 S. E. 812; *Prudential Fire Ins. Co.* v. *Alley,* 51 S. E. 812.

Realizing that they must reverse this case on technicalities if at all, the appellant in their brief devote much time and attention to the miserable little technicality that Bourgeois kept no account of the goods taken out of this commissary used by his family for a period of five or six months, and while this is true, we submit that that in this accounting could make little difference, because it must be remembered that in making out the statement of loss herein, while Bourgeois was charged with sixty-seven dollars groceries taken out of the commissary, no credit was asked or salary charged for himself and two young men, his sons, who were the sole clerks and managers of this establishment, and certain it is that if salaries had been charged in making up this statement, and placed to the credit of these boys and this old man, that the loss would have been shown more substantially than as to the value of the groceries that might have been taken out of the commissary. We note that counsel cite no authority to the proposition that this failure of charging these groceries is a violation of the iron safe clause, contenting themselves with criticizing the case of *Aetna Ins. Co.* v. *Fitze,* 78 S. W. 370, wherein it is stated:

"An iron safe clause in a fire policy requiring assured to keep a set of books, which shall present a complete record of business transacted, including all purchases, sales and shipments both for cash and credit, does not require that he shall keep an account of the goods taken out of stock for domestic consumption."

We submit that this decision is sound, that though decided in 1904, it has never been questioned, as far as any researches that ourselves or counsel for appellant have been able to find. It would certainly be unjust to defeat an assured of his right to recover under a contract as stringent as that which the insurance companies get up, where the assured had kept a proper system of books,

from which he could show his entire loss, just because he failed to enter as a sale the amount consumed by his family for their maintenance, especially so when in making up the statement, all of his time and services and that of two members of his family were not charged for and appeared nowhere in the statement.

We submit that the case cited by the appellant, *Phoenix Ins. Co.* v. *Dorsey,* 58 So. 778, has no application here, because what was held in that case was that an invoice when not coupled with other facts to identify it as an inventory of goods actually in the store, was not sufficient as an inventory. No such question is presented by this record.

REED, J., delivered the opinion of the court.

Appellee obtained a judgment for the full amount of a fire insurance policy issued to him by appellant. A defense presented in the case is that there was a violation by him of the iron safe clause in the insurance policy, in that he failed to keep such set of books as is required by the second paragraph in the clause. This paragraph is as follows: "The assured will keep a set of books, which shall clearly and plainly present a complete record of business transacted, including all purchases, sales, and shipments, both for cash and credit, from date of inventory as provided for in the first section of this clause, and during the continuance of this policy."

Appellant contends that the trial court erred in refusing to grant a peremptory instruction requested by appellant, directing the jury to find for appellee, and assess his damages at the amount of the premium paid for the insurance when the policy was issued on July 1, 1911, with interest which amount had been tendered. It appears that in January, 1911, appellee purchased from Mr. Bangard, for the consideration of five hundred and fifty dollars, the stock of goods and the fixtures of the business conducted by him at Bay St. Louis, which in-

ventoried eight hundred and sixty-five dollars. On September 28, 1911, the contents of appellee's store, including the fixtures, were destroyed by fire. In the first statement of his loss, made by appellee with the assistance of his attorney, it was claimed that the value of the property burned amounted to thirty-eight hundred dollars. Later appellee employed W. C. Fowler, a bookkeeper, to make for him a statement showing the actual loss by fire. This statement shows that the property burned amounted in value to four thousand and seventy-two dollars and forty-nine cents.

Now, did appellee keep a set of books which clearly and plainly presented a complete record of the business he transacted, including all of his purchases, sales, and shipments, both for cash and credit, from date of inventory, as specified in the second paragraph of the iron safe clause in the policy of insurance issued to him by appellant company? Were the books kept by him such as amounted to a substantial compliance with the requirements of the contract? Can there be ascertained from the books, with reasonable certainty, the actual amount of loss by the fire?

In his testimony, Mr. Fowler, the accountant, admitted that he obtained information which it was necessary for him to have, to enable him to make his statement, from other sources than the books. In short, he went outside of the books to get facts and figures needed in making a complete statement. He testified that he had to obtain invoices from merchants in order to show certain goods purchased by appellee, that he did not find entries on the books for every invoice thus secured, that there were no entries showing the purchases by appellee from the Standard Oil Company, that these purchases were in small quantities and paid for in cash, that there were no entries on the books of the amounts paid by appellee for freight. This freight he estimated to be five per cent. on the total purchases, and then added the total sum to

the purchases. He said that the books did not show what amount of cash had been received from cash sales, and what amount from collections on credit sales. Mr. Fowler estimated, from the entries of credits made on the several accounts against customers, the amounts of cash received from collections on credit sales, which were registered in the general cash received in the business. He admits, however, that he could not designate these amounts in the general record of cash received. His testimony further shows that the books contain no record of the amounts of groceries and other things taken out of the business for the support of appellee's family, and to maintain a horse and delivery wagon during the eight and one-half months appellee was in business. He estimated this amounted to sixty-seven dollars and fifty cents per month, and the total of this he used in making up his statement. It appears that the family of appellant consisted of himself, his wife, and ten children.

It will be seen that there is no record whatever in the books showing what was taken out of the business conducted by appellee to support his family of twelve people and to keep up a horse and delivery wagon. Certainly a substantial amount of the general merchandise, including groceries, dry goods, clothing, notions, and general articles composing appellee's stock of goods, were necessary for the support of his large family.

By agreement of counsel there accompanies the record the original pages of the book kept by appellee to show the cash he received from the time of his purchase to the date of the fire. With the exception of a part of the first page, the entries on these pages are in pencil. A few of the entries were made with an indelible pencil. There is nothing on these pages to show what part of the cash was from cash sales and what part from collection of the credit sales. The pages are headed, "Merchandise," except as to the two last pages, and that heading is, "To Mdse. Cash." The first entry at the begin-

ning of the first page shows, ''To Cash.'' Thereafter some of the columns of entries begin with, ''To Cash,'' and some with, ''To Mdse.'' There are, apparently, erasures and alterations in the pencil entries.

Shortly after the fire, a young lady employed in a bank in Bay St. Louis was engaged to add on an adding machine the daily entries of cash as shown on appellee's book. Her original tabulation of these entries, filed as an exhibit to her testimony at the trial of the case, by agreement of counsel, was sent up as a part of the record. Upon examination of the pages of the cash book, and comparing them with her tabulated statement, she stated that her work on the adding machine was correct; that she found many changes made in the entries on the book of cash after she made the tabulation, and she testified to these alterations, entry by entry, and fully. For instance, she showed that the entry of ninety-six dollars and seventy-five cents, made on February 18th, had been changed to sixteen dollars and seventy-five cents, and the entry made on July 7th, of one hundred and thirty dollars had been reduced to thirty dollars. These changes were made in pencil entries. The total amount of the reductions by these alterations is fourteen hundred and sixty-four dollars and fifty-five cents. Mr. Fowler, the accountant, in making his statement, took the figures as they are now on the book. Therefore there is a considerable difference in the amount of the cash received, as shown by the statement made on the adding machine, and that made by Mr. Fowler.

While not now holding that any one of the several errors and omissions in the books of appellee, or the changes therein after the fire, taken alone, is enough to render the books an insufficient compliance with the iron-safe clause, we do decide that, taken together, they show a failure to keep such a set of books as will answer the requirements of the contract.

The insured's books show substantially the total received in the store since his last inventory, and sub-

stantially the total that has gone out. Else how can the loss in the event of fire be fairly ascertained? We do not favor a literal or technical construction of the clause. We do think the books are insufficient if the actual value of the property destroyed cannot be ascertained with reasonable certainty therefrom. Account books are for the purpose of keeping a record of one's business. The record is necessary, so that it may be known what property is in hand. The books of appellee, as shown by the evidence, do not fulfill the requirements we have indicated. We do not see that his actual loss by the fire can be arrived at with any degree of certainty from appellee's books. The peremptory instructions should have been given.

Reversed, and judgment here in favor of appellee for thirty-seven dollars and fifty cents, with six per cent. per annum from July 1, 1911; costs in this appeal taxed against appellee.

*Reversed.*