## Springfield Fire & Marine Insurance Company of Springfield, Massachusetts v. Shapoff and Goldstein.

AETNA INSURANCE COMPANY OF HARTFORD, CONNECTICUT
v. SAME.

CITIZENS INSURANCE COMPANY OF MISSOURI v. SAME.

GEORGIA HOME INSURANCE CO., OF COLUMBUS, GEORGIA
v. SAME.

ROYAL INSURANCE COMPANY OF LIVERPOOL, ENGLAND
v. SHAPOFF.

HOME INSURANCE COMPANY OF NEW YORK v. SHAPOFF
AND GOLDSTEIN.

(Decided March 15, 1918.)

### Appeals from Jefferson Circuit Court
### (Common Pleas Branch, Second Division).

1.  Insurance—How Policy Avoided.—In order to avoid a policy of fire insurance under a clause providing that in case of falsehood or fraud in the making of the proofs of loss, the policy shall become null and void, the statements made under oath in the proofs must be willfully and intentionally false. Innocent mistakes or extravagant estimates of value will not have that effect.

2.  Insurance—Proofs of Loss.—Where the insurance company, through its adjusters, deny all liability on account of the policies, the insured is relieved of the necessity of presenting proofs of loss and carrying out the appraisal or arbitration agreement contained in the policy.

3.  Insurance—Iron Safe Clause.—The so-called iron safe clause is not enforceable under the law of this state. .

4.  Insurance—Inventory of Stock.—A clause in the policy requiring the insured to take an inventory of his stock of goods within thirty days of the issuance of the policy, if such an inventory has not been taken within twelve calendar months previous thereto, allows the insured thirty days from the issual of the policy in which to make such invoice, and the policy could not become null or void until the expiration of such time.

5.  Insurance—Record of Business Transacted.—A clause in the same contract of insurance providing that a set of books containing a complete record of business transacted by the insured, including purchases, sales, cash and credit from the date of the inventory, should date only from the making of the inventory, and the failure to make the invoice or to keep such set of books within said thirty days so allowed will not render the policy null and void.

McLAURIN & ARMSTEAD and DODD & DODD for appellants.

DUFFIN, SAPINSKY & DUFFIN for appellees.

OPINION OF THE COURT BY JUDGE SAMPSON—Affirming.

The above styled six actions were instituted in the Jefferson circuit court to recover on six policies of insurance issued by the appellants to L. R. Shapoff, in September, 1914, on a stock of goods situated in a store house on Jackson Street, in the town of Belzoni, Mississippi. At the time of the issual and delivery of the said policies, Shapoff was engaged in the mercantile business in Belzoni, and resided in the town. The local agents of the several insurance companies applied to him to write policies on his stock of goods and the contracts were made and written in Belzoni and were to be performed under the laws of Mississippi. S. Goldstein, of Louisville, was the chief creditor of Shapoff, and the policies of insurance, after the fire, were assigned by Shapoff to Goldstein for the benefit of Shapoff's creditors. In bringing the actions Goldstein was joined as plaintiff.

The six cases were heard together in the Jefferson circuit court and the plaintiffs recovered a verdict of $5,697.82½, for loss and damage to the stock of goods. At the same time the jury reported a verdict finding for the plaintiff against the defendant, Home Insurance Company of New York, in the sum of eight hundred dollars for loss and damage to the household furniture of Shapoff, which was at the time stored in the back part of the establishment.

Of the sum of $5,697.82½, two-ninths thereof was found by the jury against the Springfield Insurance Company; two-ninths against the Citizens Insurance Company; two-ninths against the Aetna Insurance Company; one-ninth against the Georgia Home Insurance Company, and two-ninths against the Royal Insurance Company, of Liverpool, England. Each policy issued on the stock of merchandise contained a three-fourth clause.

A motion and ground for new trial was filed by the defendants below and overruled by the court on September 30th, 1916, and time given to prepare and file a bill of exceptions. By agreement of the parties the record in the case of Shapoff, &c., against the Springfield Fire & Marine Insurance Company, which is identical with all the other cases, except the Home Insurance Company of New York, was filed in this court upon this appeal, and is to be treated as the record in each of the six

cases. All of the original exhibits filed upon the hearing in the circuit court were preserved and incorporated in a volume and filed as part of this record. This pack of exhibits includes an inventory of the stock of goods made by Shapoff at Petersburg, Indiana, in August before the fire; the original inventory and appraisement made by the agents and adjusters of the insurance companies, at Belzoni, November, 1914; the supplemental proofs of loss of date January 16th, 1915; the inventory made by Shapoff of his household goods on six loose sheets of paper, at Petersburg, Indiana; the bills of dry goods purchased by Shapoff from Louisville merchants and shipped to Belzoni in August, 1914; the original bills of laden covering the goods shipped from Petersburg to Belzoni; the financial statement made to R. G. Dunn, &c., showing the financial worth of Shapoff, and clippings from local papers of Petersburg, Indiana, showing that Shapoff conducted a reduction sale in the spring of 1915, at Petersburg. In addition to the foregoing there are many other exhibits in the nature of invoices, appraisements, letters and telegrams, which are made a part of the record.

By the terms of the policies sued on, the stock of merchandise of Shapoff, situated as aforesaid, was insured against all loss or damage by fire, except as in the policies provided, and to the extent of three-fourths of such loss or damage by fire as named in each policy, and upon said property while located and contained in the one-story brick building on the south side of Jackson Street, in Belzoni, Mississippi. The policies on the stock of merchandise were issued on the 2nd and 3rd of September, 1914, and on September 14th, Shapoff procured from the agent of the Home Insurance Company of New York a policy of insurance in the sum of one thousand dollars, insuring him against all direct loss or damage by fire to his household and kitchen furniture and family wearing apparel while contained in the building aforesaid.

Shapoff is a Russian Jew, and at the time of the fire was about forty-four years of age, having conducted different mercantile establishments in this country covering a period of more than twenty years. Before starting his store at Petersburg, Indiana, in 1913, Shapoff had converted his property into money and had in cash two thousand and nine hundred dollars ($2,900.00), and certain persons were owing him three thousand and five

hundred ($3,500.00) dollars, making a total of six thousand and four hundred dollars ($6,400.00).   With this sum he started in business at Petersburg, purchasing, as he says, about. ten thousand dollars to twelve thousand dollars' worth of merchandise.   After conducting his store for some eleven or twelve months at Petersburg, he began to cast around for a new location because the business had not been very prosperous at Petersburg.   He visited Belzoni, Mississippi, rented a store house and returning to. Petersburg some time in July, 1914.   About the first of August he invoiced and made an itemized list of each article, with its cost, and then boxed his entire stock, placed it in one end of a railroad box car, and his household goods in the other end of the same car, and shipped the whole to Belzoni, so that it arrived at that point the last days of August, where it was unloaded and placed in the store house which he had theretofore rented.   He says it required about two or three days to unload his stock of merchandise and place it in the store building.

Before the store was fairly opened the insurance agents applied to Shapoff to. insure him and Shapoff agreed to take the insurance and to divide it among the several agents representing the different companies. These policies are dated September 2nd and 3rd.  On the night of September 26th, 1914, some two or three weeks after the policies of insurance were issued on the stock of goods, a fire occurred which practically destroyed the store and its contents.   Shapoff, a man of family, was at the time living at a local hotel in Belzoni and his household furniture was located in the rear of the storehouse. Immediately after the fire Shapoff notified the insurance companies of the loss, as per the terms of the policies, and on October 9th, 1914, Shapoff met the adjusters of the insurance companies at Belzoni for the purpose of adjusting the loss.   Several conferences were had between Shapoff and the adjusters of the insurance companies without result.   Shapoff claims that at one of these meetings the adjusters and agents of .the companies charged him with causing the fire which destroyed his store, and called him a "fire bug," at the same time denying liability upon the policies.   He further asserts that the adjusters warned him to stay away from the store building, and told him in substance he need not give the remnants, or salvage of the stock of goods, any attention; that they ·did not want a "fire bug" around

there. All this is denied by the adjusters. Shortly thereafter the bank of Belzoni brought a suit against Shapoff on a note for two hundred dollars, which he had executed to the bank to procure that sum with which to pay the freight and other expenses incurred by him in transferring his stock of goods from Petersburg to Belzoni. As an incident to the action the bank sued out an attachment and garnishment and had the attachment levied upon the remnant of the stock of goods and household furniture of Shapoff. Shapoff went to see the banker and attempted to prevail upon him to allow his suit to pass until the fire insurance companies adjusted the matter with Shapoff, but this the banker declined to do. The suit was prosecuted to judgment, and the attachment being sustained the damaged stock of goods and household property of Shapoff in Belzoni were subjected to the claim of the bank and sold for the total sum of $237.25.

Being unable to adjust the claims with the insurance companies, Shapoff, who had assigned his policies of insurance to Goldstein, of Louisville, instituted these six actions.

The first paragraph in each answer in the six cases is a denial that the property covered by the policies was totally destroyed by fire, and a denial that the proofs of loss conformed to the terms of the policies, and a further denial that the actual cash value of the merchandise destroyed was $11,860.85, as claimed by Shapoff, or that the cash value of the household effects destroyed were $1,449.75, as claimed by Shapoff.

The answer further alleges that the policies of insurance were in form known as "New York standard," and that each contract was made, executed and delivered in Belzoni, Mississippi, and was to be performed in that state and, is governed by section 2563, of the code of laws of the state of Mississippi, and by the common, or unwritten law of the state of Mississippi, as embodied in the decisions of its courts.

By the second paragraph of the answer certain provisions of the policies were affirmatively plead and relied upon, making the insurance company liable only for the cash value of the property destroyed and allowing proper deduction for depreciation, and in no event to exceed the cost thereof, or the cost of replacing the damaged or destroyed property. And further, that in

no event could there be an abandonment of the property by the insured.

The third paragraph of the answer charged Shapoff with fraud and false swearing in making and presenting his proofs of loss, and set up and relied upon a provision of the policies to the effect that in case of any fraud or false swearing by the insured touching any matter relating to this insurance or the subject thereof, whether before or after loss, should avoid the policy.

It is charged in the fourth paragraph of the answer that Shapoff failed to use reasonable means to save and preserve the property, either during or after the fire, and the companies rely upon a provision of the policies that in case of such failure on the part of the insured no recovery can be had.

A clause of the policies contains the following: "If a fire occur, the insured shall give immediate notice of any loss thereby in writing to this company, protect the property from further damage, forthwith separate the damaged and undamaged personal property, put in the best possible order, make a complete inventory of the same, stating the quality, the quantity and cost of each article, and the amount claimed thereon."

And it is alleged in this paragraph that Shapoff neglected to separate the damaged and undamaged personal property and relied upon his failure so to do to defeat his recovery.

The answer further charges that Shapoff neglected to keep a set of books that would show or enable the insurance companies to determine the loss, and what is commonly known as "the iron safe clause" of the policy was relied upon, it being provided in the contract that: "In the event of failure to produce such set of books and inventories for the inspection of this company, its policies shall become null and void, and such failure shall constitute a perpetual bar to any recovery thereon."

Issue being joined the questions of fact were tried by a jury.

It now is asserted: (1) That the court erred in its instructions to the jury; (2) the defects in the pleadings were not cured by the verdict and judgment; (3) the admission of incompetent testimony given by Sapinsky, attorney in the case; (4) error of the trial court in assuming that the adjusters had a right to take possession of the damaged property, thus waiving the provisions

.of the policies; (5) failure of the court to hold as a matter of law that Shapoff was not entitled to recover upon the policies of insurance because the proof showed him guilty of fraud and false swearing.

Both sides raise questions as to the sufficiency of the pleadings, and without going into a discussion of these several questions we deem it sufficient to say the pleadings substantially present the issues necessary for the determination of the disputed points; albeit, they are not in all respects without their imperfections.

Quite a good deal of space is occupied in the briefs of counsel in a discussion of *partial loss* and *total loss,* as applied to the property insured. The facts show that after the fire no inconsequential part of the stock of goods remained, but it is further shown by the evidence that of this remaining stock little, if any, was not damaged by either fire, smoke or water as a direct result of the fire, much of it so badly as to have no commercial value, while other parts were of little value to a merchant. The adjusters claim that the stock after the fire was worth several thousand dollars, but Shapoff and his witnesses insist that the value of the stock was negligible. In the proofs of loss submitted by Shapoff he claims a total loss, and stated that after the fire he made a careful examination of what merchandise remained on the premises, and found that the same was so burned, "I would not give thirty cents for such of the merchandise as was left; same was utterly valueless except as trash and has no such thing as a sound value, or value of any kind." This statement was later somewhat modified by Shapoff in subsequent proofs of loss. It is urged by Shapoff that while there remained some remnants of the stock of goods, in truth and in fact he did suffer a total loss as to its value. The distinction may well be recognized that a total loss may not mean a total destruction or consumption. In other words a total loss to the insured may mean only that the stock of goods is rendered valueless even though a considerable bulk thereof remain intact. In an amended petition Shapoff urges only a partial loss, and the evidence sustains this allegation.

In this connection, it is proper to consider the charge of false swearing made by appellants against Shapoff. By his petition Shapoff asserted not only a total loss of his stock of goods, but that he would not give thirty cents for what remained, and that the remnant had no

such thing as a sound value. The record discloses that the remnant of the stock was afterwards sold under a judgment of the Mississippi court in the case of the Belzoni bank against Shapoff for $237.25. Several witnesses testify that the goods after the fire were worth several thousand dollars, and this, appellants claim, sustained their contention that Shapoff knowingly and corruptly presented false proof of his loss, whereby the policies of insurance are avoided. The rule as stated in Western Assurance Co. v. Ray, etc., 105 Ky. 523, is as follows:

"False statements made under oath in proofs of loss must be intentionally made to avoid the policy. Innocent mistakes, or extravagant estimates of value will not have that effect."

And it may properly be said that where the false statement is based upon the affiant's judgment or estimate of the value of the goods, or other property, the policy will not be affected.

At most the statement in the affidavit made by Shapoff was an expression of an opinion, not a statement of fact. It was Shapoff's opinion that the goods after the fire had no commercial value, or, to use his expression, "no sound value," while it was the opinion of other witnesses that the goods had value. The expression of an opinion as to the value of goods is not such statement as would sustain a charge of false swearing, or as would support a charge of fraud even in a civil action. Likewise the statement that he had sustained a total loss is but the expression of his opinion of the value of the goods after the fire. He made no statement that the fire wholly or totally consumed the stock of goods, or that there was no remnant left, but only that the goods which were left were without value, which was merely his opinion. This, therefore, was not such a violation of the provisions of the policy with reference to *fraudulent statements,* or *false swearing,* as to vitiate the policy according to its terms. The question of the falsity of the proofs was submitted to the jury, and the jury instructed to find against the plaintiffs if such proofs were wilfully and substantially untrue in any material respect, but that innocent mistakes or reasonable over-estimates will not have that effect.

The following from Richards on Insurance is quoted

with approval in Western Assurance Co. v. Ray, 105 Ky. 530:

"As a general rule, false swearing in a proof of loss, to vitiate the policy, must be intentionally false, whether by fraudulent overvaluation of the goods destroyed or a statement of items which really have no existence. An innocent mistake, or a mistake through exaggerated estimate of value, is not sufficient to void the policy. An overvaluation in order to work a forfeiture must be so plain that it can not be accounted for upon the principle that every man is naturally prone to put a favorable estimate on the value of his property." See Richards on Insurance, p. 144; Agricultural Insurance Co. v. Yates, 10 Ky. L. R. 207 (13 S. W. 1080); Dwelling House Insurance Co. v. Freeman, 12 Ky. Law Rep. 894; Insurance Co. v. Weides, 14 Wall. 375.

Shapoff contends that the adjusters for the companies in their meeting with him after the fire denied all liability for their companies. He testifies to statements which he says these adjusters made that amount to a denial of liability for their companies. All these statements were unequivocally denied by the adjusters. It, therefore, becomes a question of veracity. The question of denial of liability was submitted to the jury and found in favor of Shapoff. If such denial was made, and the jury so found the facts, it was unnecessary for Shapoff to attempt to carry out the appraisal agreement contained in the policy (Insurance Co. v. Forward, 13 R. 261) or to submit the proof of loss (Home Insurance Co. v. Koob, &c., 113 Ky. 360.)

The point is made by appellants that Shapoff failed to separate the damaged from the undamaged goods, as required by the terms of the policies. Shapoff gives as his reason for so failing, the request of the representatives of the insurance companies not to bother about the goods. But this is denied also. This question of fact was also submitted to the jury and found in favor of Shapoff. If the insurance companies requested Shapoff to keep away from the damaged goods and he did so, they are in no position to complain.

The principal fight of appellants is marshaled around the so-called iron safe clause of the policy. This clause is on a separate sheet of paper and is pasted to the principal contract as a rider. It reads as follows:

## "Iron Safe Clause.

### Warranty to Keep Books and Inventories, and to Produce Them in Case of Loss.

"The following covenant and warranty is hereby made a part of this policy;

"1. The assured will take a complete itemized inventory of stock on hand at least once in each calendar year, and unless such inventory has been taken within twelve calendar months prior to the date of this policy, one shall be taken in detail within thirty days of issuance of this policy, or this policy shall be null and void from such date, and upon demand of the assured the unearned premium from such date shall be returned.

"2. The assured will keep a set of books, which shall clearly and plainly present a complete record of business transacted, including all purchases, sales and shipments, both for cash and credit, from date of inventory, as provided for in the first section of this clause, and also from date of last preceding inventory, if such has been taken, and during the continuance of this policy.

"3. The assured will keep such books and inventory —and also the last preceding inventory, if such has been taken—securely locked in a fireproof safe at night, and at all times when the building mentioned in this policy is not actually open for business; or, failing in this, the assured will keep such books and inventories in some place not exposed to a fire which would destroy the aforesaid building, and, unless such books and inventories are produced and delivered to this company for examination, after loss or damage by fire, to the personal property insured hereunder, this policy shall be null and void, and no suit or action shall be maintained hereon. It is further agreed, that the receipt of such books and inventories and the examination of the same shall not be an admission of any liability under this policy, nor a waiver of any defense to the same."

This identical iron safe clause has been before this court in Phoenix Insurance Co. v. Angel, 18 R. 1034; McChanics Insurance Company v. Crist, 19 R. 305; Citizens Insurance Co. v. Crist, 22 R. 47, and has in each instance been held invalid and unenforceable under the laws of this Commonwealth. The point is made, however, that by the law of the state of Mississippi the iron safe clause is recognized as valid and enforceable, and many cases from the Mississippi Supreme Court to

that effect are cited. Among the cases are: Aetna Insurance Co. v. Mount, 90 Miss. 642; Phoenix Insurance Co. v. Dorsey, 102 Miss. 81; Insurance Company v. Bourgeois, 105 Miss. 698; Penix v. American Central Insurance Company, 106 Miss. 145. These cases support appellants' contention.

The so-called iron safe clause is a misnomer so far as this record is concerned, because it is not claimed that Shapoff violated the contract in failing to have or keep an iron safe, but it is admitted that his books and records were not destroyed by the fire, and such as they are have been introduced in evidence. The challenge is to their integrity, regularity and sufficiency. While in fact Shapoff did not have an iron safe, as required in subsection 3 of the iron safe clause, it is admitted that the assured did keep his books and inventories in a place not exposed to the fire which destroyed the building and stock of goods, as provided in the latter part of the third section of the iron safe clause in the policies. Admitting that the iron safe clause is not recognized by the courts of Kentucky, yet appellants insist that as these contracts of insurance were made in Mississippi between citizens of Mississippi to be performed in that state, they are Mississippi contracts and partake of the law of that state, and by the comity of states must be sustained and enforced by the courts of Kentucky, applying the law of Mississippi where they are held valid. On the other hand, appellant's counsel takes the position that the *iron safe clause* is invidious to our law. and against public policy, and has several times been declared invalid because unsupported by a sufficient consideration. It is further asserted that even though by the comity of states the courts of one state recognize and enforce the rules of law of the place where the contract is made and to be performed, yet this rule will not be applied where to do so will violate its public policy or injuriously affect its citizenship, and that the Kentucky courts will not do so in cases where the provisions of the contract are repugnant to our public policy, injurious to our citizenship, or is without consideration, and this is the true rule. The situation here is somewhat different from any case decided by this court which has come to our attention. These are admittedly Mississippi contracts and must, so far as the laws of this Commonwealth permit, be construed and enforced according to the laws of Mississippi. It is also

conceded that the iron safe clause is repugnant to our recognized rule. In a somewhat similar state of case this court has held that a contract which violates our public policy but which is valid and enforceable by the laws of the state where made has nevertheless no vitality when declared upon in our courts and will not be enforced. However, the decision of these cases might be rested entirely upon the provisions of the iron safe clause contained in the policies, for while providing that the insured shall make a complete itemized inventory of stock on hand at least once in each calendar year, and unless such inventory has been taken within twelve calendar months prior to the date of the policy, one shall be taken in detail within thirty days of the issuance of the policy, "or this policy shall be null and void from such date," and "the assured shall keep a set of books which shall fairly and plainly present a complete record of business transacted," this set of books is not required to antedate the inventory. In other words if the insured has not taken a complete itemized inventory of stock within twelve calendar months next before the issual of the policy, then he must do so within thirty days thereafter, or "this policy shall be null and void *from such date.*" By the expression "from such date" modifies and refers to the end of the thirty days given for the taking of the itemized inventory. The set of books also shall begin and run from the date of the inventory, as provided for in the first section. In this case, Shapoff obtained the policies of insurance on the 2nd and 3rd days of September, 1914. He had thirty days from that date in which to take an itemized inventory of the stock; if he failed to take such inventory within the thirty days then the policies provide that they should become null and void from the end of the thirty days. The fire occurred upon the 26th of September, which was less than thirty days from the issual of the policy, and before the end of the time given for making the inventory or set of books. Certainly the policy was in force for thirty days from that issuance even without the taking of the itemized inventory by the insured, because Shapoff was allowed that time in which to make the invoice and book. As the second clause of the same rider requiring a set of books to be kept is ancillary to and dependent upon the inventory and required the set of books to date only from the time of taking the inventory, it follows that the set of books

named in this clause may be made at any time within the thirty days from the issuance of the policy, provided the books date from the same time as the invoice. The failure to make such set of books or to take such inventory for any time less than thirty days did not work a forfeiture of the contracts of insurance. It follows, therefore, that the policies of insurance were in full force on the 26th of September, the date of the fire, even if the so-called iron safe clause be regarded as valid.

Appellants complain of all of the instructions given to the jury except number one, which they concede is practically correct. Instruction number two submits to the jury the question of whether Shapoff kept a set of books and inventories such as contemplated by the policies of insurance, and whether the book containing an alleged inventory exhibited in evidence truly "showed the amount of goods which were put in the store and the entries as to cash from sales were true for the time covered by such entries, but if entries in such book and the inventories were in any particular substantially untrue, then I instruct you that the plaintiff can not recover." The plaintiff's evidence, upon which this instruction is based, shows that an invoice was made of the entire stock of merchandise and household goods at Petersburg before the same was shipped to Belzoni. This inventory was by items placed on slips and transferred by Shapoff in his own handwriting to the book introduced in evidence. Plaintiff further shows that after carefully packing and loading all the goods in a separate car, it was shipped to Belzoni and arrived there in due course in good condition, and that plaintiff, Shapoff, unloaded and personally unpacked the goods and checked off from the inventory the same, item by item, in the store room in Belzoni, and that each and every item on the book introduced in evidence was found to be there and was placed in the store. This checking of the invoice list and the handling and counting of each article was equal to the taking of an invoice of the stock. It amounted to the same thing because each item was found as listed and accounted for. The evidence of Shapoff, if it can be relied upon, clearly proves that each item of the invoices offered in evidence, was actually in the store at Belzoni at the time of opening the store only a few days before the fire, and that the sales from stock during the few days which intervened between the time of the opening and the fire, were inconsiderable.

The trial court in telling the jury to find the inventory and book exhibited in evidence, a sufficient compliance with the requirements of the policies if the jury believed said book and invoice truly showed the amount of goods and the sales, correctly stated the rule. Plaintiff contended that the book showed every item correctly, and that his sales were correctly given. Defendants denied both claims and intimated, if they did not say outright, that both the books and invoice were mere phonies and not entitled to credence. If the integrity of the book be admitted, its form and detail are sufficient.

In numerous cases this court has held that an agent of an insurance company may by words, acts or conduct waive a forfeiture clause in a policy and we can conceive of no reason why the adjuster, an agent, with broad powers, may not waive a provision of the policy requiring the insured after a fire to separate the damaged from the undamaged goods, and where the agent notifies the insured to keep away from the remnant of the damaged stock, or directs the insured that he need not concern himself further about the salvage, the insured is relieved of the necessity of separating the damaged goods from the undamaged. Especially does this rule apply where the adjuster charges the insured with being a "fire bug" and demands that he keep away from the property. This principle is very aptly stated in the third instruction of which complaint is made.

Instruction number four correctly submits the question of appraisement or arbitration, and instruction number five states the law applicable to the facts on the issue of false swearing in the presentation of proof of loss.

Instruction number seven is complained of because, as claimed by appellants, there was no allegation or proof of the extent of the partial loss, a damage sustained by Shapoff. This contention also is without merit.

Considered as a whole the instructions given by the trial court fairly present the law of the case.

The record in this case is very long and difficult to grasp; the issues are many, and while there are several errors in it, none appear to prejudicially affect the rights of appellants.

Judgment affirmed.