No. 29,231.

J. A. BUNDY, *Appellee,* v. THE NATIONAL FIRE INSURANCE COMPANY, *Appellant.*

(288 Pac. 738.)

Opinion filed June 7, 1930.

Robert Stone, James A. McClure, Robert L. Webb, Beryl R. Johnson, all of Topeka, and W. L. Sayers, of Hill City, for the appellant.

T. M. Lillard, Bruce Hurd, O. B. Eidson, all of Topeka, and J. O. McVey, of Hill City, for the appellee.

The opinion of the court was delivered by

HUTCHISON, J.: This is an action upon a fire insurance policy covering a stock of drugs, store fixtures and some household furniture, in which judgment was rendered for plaintiff, and the insurance company appeals.

The main question involved is that of compliance with the iron-safe clause contained in the policy, particularly with reference to the making of an inventory and the keeping of books showing a complete record of purchases and sales, and incidentally in connection therewith are the questions arising on the trial as to the admissibility of testimony, the ruling upon the demurrer, the giving of instructions, the sufficiency of the evidence and the excessive amount of verdict rendered.

The loss was total. There was no iron safe kept in the place of business. None of the books and papers that were kept were destroyed by the fire.

The iron-safe clause is as follows:

"Inventory—Iron-safe clause.—(Requirement to keep books and inventory.) It is made a condition of this insurance: (1) That the assured under this policy shall take an inventory of the stock and other personal property hereby insured at least once every twelve months during the term of this policy, and unless such inventory has been taken within one year prior to the date of this policy, one shall be taken in detail within thirty (30) days thereafter; (2) that the assured shall keep a set of books showing a complete record of business transacted, including all purchases and sales both for cash and credit; (3) that the assured shall keep such books and inventory securely locked in a fireproof safe at night, and at all times when the store mentioned in the

within policy is not actually open for business, or in some secure place not exposed to a fire which would destroy the building where such business is carried on; (4) that in case of loss the assured shall produce such books and last inventory."

The courts of Kansas have regularly recognized the reasonableness of this provision in fire insurance policies and have enforced the terms thereof, adopting, however, the theory of a substantial rather than a literal or technical compliance therewith. (*Insurance Co. v. Knerr*, 72 Kan. 385, 83 Pac. 611.)

Appellant concedes the requirement to be only a substantial compliance, but insists that the attempted compliance in this case is no compliance whatever.

The policy was issued by appellant February 15, 1926, to Earl M. Minor, who was at that time operating a drug store in the small town of Bogue, Graham county, Kansas, nine miles from Hill City. He also served lunches in the store. It was issued against loss by fire to a stock of merchandise to the extent of $1,000 (except as modified by the three-fourths-value clause), to store and office furniture and fixtures to the extent of $2,000, and to household goods and kitchen utensils to the extent of $400. On September 13, 1926, Minor sold the insured property to J. A. Bundy, the plaintiff, a physician residing at Hill City, and the policy was assigned to him by the insurance company the same day. He took charge two days later and retained Mrs. Minor, mother of the vendor, to operate the store for him, which she did until the fire which occurred on January 29, 1927. She and her children lived in the back part of the store building until shortly before the fire. The serving of lunches was discontinued some little time before the fire. Much of the household and kitchen furniture in the store when plaintiff purchased it was sold to Mrs. Minor and removed. The claim of the plaintiff was $1,198.36 for merchandise, $1,167.75 for store fixtures and $82.50 for household goods and utensils.

The iron-safe clause requires that the insured shall take an inventory of the stock and appellant urges that the pretended inventory offered in this case was not an inventory, but an invoice; that it was not taken by the insured, but by the vendor for the purpose of making a sale and transfer of the goods, and was not complete nor made at the required time. It was an itemized, detailed list of articles, merchandise or stock in trade of a merchant with valuations. (3 Joyce on Insurance, § 2063k.) It consisted of

nine pages of articles in detail as to kind and number of each with price set opposite each kind. It is true it was made up by Minor, the retiring druggist, for the purpose of effecting a sale to the plaintiff, and given by Minor to the plaintiff, but that does not make it an invoice as distinguished from an inventory, because it lacks the contingency of safe arrival at destination, no shipment being here contemplated. (3 Joyce on Insurance, § 2063n.) The contention that because it was in fact made by the vendor instead of the plaintiff, the insured, might be serious if the record had not shown that the plaintiff had carefully gone over the list by comparing it with the articles found by him on the shelves and in the store; that he had spent considerable time in verifying it before accepting it. He disclaimed an actual verification of each and every article contained in the list, but did make such detailed examination and verification to fully satisfy himself that it was correct. He further showed he, as a physician, was familiar with prices and knew those used in this list to be correct. After this examination and comparison, he adopted this list and inventory as his inventory, and we know of no good reason why it should differ from one made for him by an assistant or subordinate. The evidence shows it was compiled between the 1st and 15th of September, and appellant complains of the discrepancies that must exist as to sales during that period or between its completion and the turning over of the stock to plaintiff. We have no showing that the sales during the invoicing period were not reflected into the inventory, as they usually are or should be. It was dated September 9 and naturally should show the stock as it existed that day rather than September 1, when the listing began. The four days intervening between the date of the inventory and the date of the bill of sale, or the six days to the time plaintiff took over the stock, and the failure to account for sales and purchases during that time are not of sufficient moment, in a limited business like this was said to be, to affect the validity or the practical sufficiency of the inventory. The situation here is not like that in some of the cases cited, where the invoices from the wholesale houses were substituted for inventories, nor where an inventory was made after the thirty-day period had expired, nor as in the case of *Pennsylvania F. Ins. Co. v. Malone,* 56 A. L. R. 1075, where the inventory was made by the vendor and left in the safe when he sold the store and the purchaser did nothing with it or anything toward adopting it or making a new inventory until many months later.

In the case of *Springfield F. & M. Ins. Co. v. Shapoff and Gold-stein,* 179 Ky. 804, where the owner of a stock of merchandise took a complete inventory of it and then shipped it to himself at another town, carefully checked it out there and compared it with the inventory previously made, and the loss occurred two or three weeks after beginning business in the new town and taking out insurance on the stock, it was there held:

"This checking of the invoice list and the handling and counting of each article was equal to the taking of an invoice of the stock. It amounted to the same thing because each item was found as listed and accounted for. The evidence of Shapoff, if it can be relied upon, clearly proves that each item of the invoices offered in evidence was actually in the store at Belzoni at the time of opening the store only a few days before the fire, and that the sales from stock during the few days which intervened between the time of the opening and the fire, were inconsiderable. The trial court in telling the jury to find the inventory and book exhibited in evidence, a sufficient compliance with the requirements of the policies if the jury believed said book and invoice truly showed the amount of goods and the sales, correctly stated the rule." (p. 816.)

In the case of *Miller v. Home Ins. Co. of N. Y.,* 127 Md. 140, where the insured made the inventory for the purpose of purchasing the stock of goods which were destroyed by fire a few weeks after his purchase, it was held such inventory was within that contemplated by the policy, as follows:

"It is clear from the appellant's own description of the schedule made by him at the time of his purchase of the store, that it had every feature which an inventory could be supposed to possess. It was a complete and itemized list of the various commodities embraced in the stock in trade, with quantities and values indicated in detail. The prices listed therein by the appellant were those representing in his judgment the worth of the corresponding articles as forming part of the general stock he was proposing to buy. Upon the basis of the schedule thus prepared he purchased the stock and fixtures at a price closely approximating the value it disclosed. While it was made with a view to the purchase of the property and before the appellant had taken charge of the store, it was exactly the kind of an inventory that would ordinarily be expected to be made in the course of the business to meet the requirements of the contract of insurance." (p. 143.)

The fact that a preliminary or basic list was made by the former owner of the stock certainly does not detract from the correctness of the schedule when the purchaser, thoroughly familiar with such goods and their prices, carefully checked the list over and compared its entries and items with the articles found on the shelves and in the store; but it should be an additional assurance of its reliability.

And when after such careful checking and comparison the insured, as a purchaser, adopted it as his inventory and a correct schedule of the stock of merchandise, it is certainly such an inventory as to constitute a substantial compliance with the requirements of the policy in this particular.

The record in this case shows that the insured really kept no books showing his purchases and sales, but introduced the original invoices showing the purchases made by him during the period of a little more than four months that he operated the store, and the bank records to show the deposits made from sales, with the oral explanation that all the sales were made for cash except two items of $8 and $2 during that period, and that the cash was taken about every other day from the cash register to the bank and deposited to the credit of the plaintiff by Mrs. Minor, who had charge of the business during that period. He did keep a bank pass book which showed all such deposits, the entries having been made in it by the cashier of the bank, and that such pass book was not destroyed by fire, but had been in the possession of the insured long after the fire, but was mislaid and could not be found at the time of the trial; hence, as secondary evidence, resort was had to the bank records to show such deposits.

The evidence showed that nothing but two or three small bills for freight or drayage was ever paid out of the cash register; that all bills were paid by the insured from other funds or by check on the funds deposited.

Complaint is made of Mrs. Minor and her children eating at the lunch counter without compensation while that was in operation. This would, of course, lessen the amount of cash receipts which could be deducted from the value of the stock on hand or goods purchased. So would every sale at reduced price or less than cost, which is a feature of modern business. On the other hand, sales at 25, 50 or 100 per cent advance would, if deducted from the inventory total, in due time wipe out the value of the entire stock and invoices. These are incidents to the business and necessary inaccuracies, especially in a small business without an intricate book-keeping system.

"The provision as to keeping of books of account requires that the insured shall keep such books in such a manner as that they shall constitute a record of business transactions which a person of ordinary intelligence accustomed to accounts can understand.

. . . . . . . . . . . . . . . .

"It is not necessary that the books should be kept according to any particular system, nor that they should be such a scientific system of books as would satisfy an expert accountant in a large business house in a city." (3 Cooley's Briefs on Insurance, 2d ed., 2818, 2819.)

". . . The object or purpose of the clause should be considered, as it evidences to some extent what was contemplated by the parties as to compliance with the requirement, and from this standpoint the nature and extent of the business, whether the stock insured is that of a large department store with expert assistants, or merely the stock of a small country store, should be considered, as should also the custom of the place and the customary manner of doing business, . . . if it can be approximately ascertained from the assured's invoices of purchases, and his books and entries of cash and credit sales, what the amount of goods in stock was at the time of the loss, there is a substantial and sufficient compliance." (3 Joyce on Insurance, 2d ed., § 2063f.)

". . . The 'book warranty' clause in the policy is complied with by the assured if he keeps such a set of books that a man of ordinary intelligence can from them reasonably ascertain the amount and value of the stock of goods at the time of the fire." (*Springfield Fire & Marine Ins. Co. v. Halsey,* 52 Okla. 469, 474.)

"In the case at bar it appears that the insured had taken an inventory within the time prescribed in the policy, and after taking the inventory had retained the invoice of each bill of goods which he had purchased and added to his stock up to the time of the fire. He had a cash account showing the amount of each cash item taken into the business from the date of the inventory, with the exception that it was shown that small bills for drayage and the like had been paid out of the cash drawer before the accounts were taken at night, and listed in the cash book. . . .

"The rules of law applicable to insurance policies must be applied with some view to common sense and to common justice. In a mercantile business, where a credit was given extensively and no account kept thereof, or where large running expenses were paid out of the cash, without any account being kept, it might very consistently be said that a set of books, failing to show the credits and expenses, were not a substantial compliance with the conditions of the policy, but in a case like the present one, that of a small country merchant, where the store was operated by himself and wife, where the expenses paid could not have been large, and where, as shown, the credits extended are not put on the books, were so small that the plaintiff himself thought so little of them that he did not keep an account of them, and where it further appears that the relation of the amount of the policies to the size of the stock was such that the taking into account the reasonably probable expenses of the business and credit sales, still there must clearly remain such an amount of stock that the full amount of the policies would be payable to the insured, then we think that such a set of books as was here shown to be kept was a substantial compliance with the terms of the policy within the rule. . . ." (*Queen Ins. Co. of America v. Dalrymple,* 60 Okla. 28, 29.)

In *Dorough v. Reliance Ins. Co.*, 289 S. W. 703 (Tex.), the sales were made for cash, as here, and entries made in the pass book by the cashier of the bank. It was there admitted that in a few instances small sums had been taken out of the cash drawer for expenses, and it was held that such entries were a sufficient record of sales within the provisions of the policy.

"There is no particular divinity that surrounds this clause, nor is there any particular system of bookkeeping that must be used. The books of a country merchant can hardly be expected to exhibit the same accuracy as those of a large city institution. This clause has been of frequent consideration by the courts, and the proposition is now well established that a substantial compliance therewith is all that is essential." (*New York Underwriters' Fire Ins. Co. v. Malham & Co.*, 25 Fed. [2d] 415, 421.)

Appellant complains that part of the proof with reference to sales and purchases was made by parol evidence. From careful examination of the record we are not so impressed. Parol evidence was used, and is proper to be used, to explain the written evidence. (*Pennsylvania F. Ins. Co. v. Malone*, 56 A. L. R. 1075.)

Many criticisms are made of the invoices and account of sales, but none of the defects pointed out is of serious moment or of such character to prevent the parties from arriving at a conclusion substantially accurate.

The conclusions above indicated dispose of the assigned errors in the admission of testimony, the overruling of the demurrer to the evidence and in the giving of instructions, unless it might be instruction No. 7, where the court instructed that the knowledge of the cashier of the bank with reference to the deposits of the insured being made from the sales, was the knowledge of the insurance company because he was the agent of the company. We are inclined to agree with appellant that the rule here given does not apply except in such matters as are connected with the business of the principal, and the keeping of an account at the bank and making deposits of all the money derived from sales had no connection with the insurance business. We fail, however, to see wherein the appellant could have been prejudiced by such instruction. The insurance company did not need to know prior to the loss how the sales money was being handled, so that feature was wholly immaterial and certainly could not have been in any way decisive or prejudicial. He did have such a double interest with reference to the chattel mortgage mentioned in an earlier instruction.

We find no reversible error in the giving of any of the instructions.

We have no difficulty in harmonizing the amount of the verdict with the testimony, and as being within the reasonable limits thereof. The rearrangement of the items of the verdict by the jury in combining two of them is not inconsistent with the claims made or the proof offered, and can be readily understood.

The judgment is affirmed.