# New York Underwriters' Insurance Company v. Mullins et al.

(Decided June 7, 1932.)

(As Modified on Denial of Rehearing September 27, 1932.)

790

FRANK M. DRAKE and DYSARD & TINSLEY for appellant.

JOHN T. DIEDERICH and LOVEL LILES for appellees.

OPINION OF THE COURT BY JUDGE RICHARDSON— Reversing.

This appeal requires a review of a trial by a jury of an action wherein W. J. Mullins and F. H. Mullins sought to recover of the New York Underwriters' Insurance Company, the appellant, on an insurance policy, dated June 11, 1926, and issued and delivered by it to them, insuring them against loss by fire, in the sum of $1,800 on a stock of merchandise and $500 on the fixtures, located at Russell, Ky., and which were destroyed by fire in October, 1926. The jury returned a verdict fixing the amount of their recovery at $1,500 for the merchandise and $250 for the fixtures. A judgment was entered accordingly, from which the appellant prosecutes this appeal.

For reversal, it is insisted that the court erred in refusing a continuance; admitting incompetent evidence; the instructions to the jury; refusing to give the instructions offered by it; and in refusing to observe the period of limitation of one year, which was fixed by the contract of insurance.

It is unnecessary to consider its motion for continuance, since the judgment must be reversed on other grounds, and the question may not arise on another trial.

A consideration and disposition of one objection to the admisson of evidence require a review of the petition. There is no averment in it of the value of the stock of goods and fixtures at the time of their destruction. The evidence relating to the value of the property at the time of its destruction by fire was objected to by the appellant. Its objection was overruled and proper exceptions were

saved. The instructions given were objected to, the objection was overruled, to this ruling an exception was taken by the appellant. Such exceptions of the appellant entitle it in this court to avail itself of its objection to the admission of the evidence tending to show the value of the destroyed property. In the absence of an allegation in the petition setting out the value of insured personal property at the time of its destruction by fire, such evidence was incompetent under the authority of Federal Fire Ins. Co. v. Harvey & Co., 225 Ky. 838, 10 S. W. (2d) 311, and Svea Fire & Life Ins. Co. v. Walker, 235 Ky. 289, 30 S. W. (2d) 1105.

A review and consideration of the objections to the evidence on other grounds as well as the instructions which were both given and refused by the court require of us a succinct statement of the evidence.

J. B. Mullins is the father of W. J. and F. H. Mullins. In 1925 J. B. Mullins resided in Pike county, owned a small stock of groceries estimated to be of the value of about $200, when he removed them to Russell, Greenup county, Ky., where he engaged in the grocery business. He claims that in 1925 W. J. and F. H. Mullins purchased from one Simpkins a small stock of groceries and fixtures at the price of $235. The Simpkins fixtures consisted of an ice box, of the value of $15 or $20; counters and shelves, $40 or $50; small scales, $35. J. B. Mullins, in July, 1925, purchased a stock of groceries of Mead at the price of $502. He also claims that in November, 1925, he sold the stock of groceries which was moved by him from Pike county to Russell, and the stock purchased by him from Mead to W. J. and F. H. Mullins, his sons, at the price of $1,100 cash, carried by them on their persons. At that time one of the boys was 23 and the other 21 years of age, both engaged as motormen in the mines in Harlan county, Ky.

J. B. Mullins further claims he purchased, either in the latter part of December, 1925, or the first part of January, 1926, of Bear "a department stock" of merchandise consisting of men's, boys, and women's wearing apparel and furnishings, including shoes—no groceries —at the price of $2,000, $1,000 of which was paid by a "lot of that value" and the remainder by ten notes of $100 each, payable one each month thereafter until all were paid.

On the 2nd day of February, 1926, by writing executed and delivered by the Standard Computing Scale

Company to J. B. Mullins, it sold and delivered to him, f. o. b. factory, computing scales at the price of $230, payable $15.50 on delivery, $75 allowed to Rush Simpkins, and the balance of $139.50, in equal installments each month thereafter for a period of ten months. It should be noted that he disclaims ownership of the groceries at the date of his purchase of the scales.

Again J. B. Mullins claims that on the 5th day of April, 1926, he sold to his sons, W. J. and F. H. Mullins, at the price of $2,700, the stock of merchandise which he had purchased from Bear, and for which they paid him in cash $1,700 or $1,800 which they had on their persons; thus making $2,800 or $2,900 cash paid to him by his sons from November, 1925, to April 5, 1926. They had no account with any bank. At the time this transaction occurred, his sons were still motormen in the mines in Harlan county. They had had no previous experience or knowledge of the mercantile business, and no inventory was made of either the groceries or drygoods at the time of their purchases. Neither they nor J. B. Mullins had any knowledge of the wholesale prices of such merchandise, nor had they or he bought, or sold, such merchandise before J. B. Mullins purchased the Bear stock. It was bought in bulk by him without any regard to the original cost price.

It is not shown that J. B. Mullins deposited the two cash payments in any bank in any name. After receiving the $1,700 or $1,800, J. B. Mullins continued to pay monthly his notes for the scales and the Bear stock of merchandise, as they matured, the last one of which was about the time of the fire. According to his testimony, he bought and executed notes for the computing scales after he had received the $1,100 for his stock of groceries. After his sons acquired ownership of the merchandise, they again returned to the mines and continued their occupation as motormen. J. B. Mullins continued in active charge and management of the store without salary or wages, and continued to supply his wants from the store without making or keeping any record or account of the amounts or value of the articles used by him. At the time of his sale of the Bear stock, he claims that he retained ownership of $300 worth of the Bear stock, which he kept in the store as part of the stock, mixed and mingled with that portion of it which had been sold to his sons. He employed help occasionally, but permitted himself and such helpers to sell of this

$300 worth as well as that portion which he claims to have sold his sons, without making or keeping any record indicating from which the sales were made and without warning the helpers of the presence of his $300 worth of the goods.

The Machinist & Traders' Insurance Company issued a policy insuring the stock of groceries and merchandise now involved, which continued in force until May, 1926, when its representative visited the Mullins store at Russell, and observed, as he says, the stock of goods on hand; he noticed empty boxes in which shoes had been, "a rather crude rack five or six feet high, and about eight or ten feet long, made of ordinary rough lumber, 5x6, and nails driven therein five or six inches apart, with shoes hanging on it by their strings." The shoes were of various kinds, "little out of style, some sharp toed others bulldog-ends, and others, button, and possibly some army shoes, ladies' high heel shoes, old style. A small iron cot and wash stand with a bowl and pitcher, stove and bed clothes were in the back room."

After making this survey, he caused his company to cancel its policy. The property remained uninsured from that time until the 11th day of June, when the policy here involved was issued. It does not appear in whose name the policy of the Machinist & Traders' Insurance Company was issued and delivered; nor does it appear whether the $300 worth of the Bear stock of merchandise, which J. B. Mullins claims he retained at the time of the sale of the merchandise to his sons, was or was not covered by the policy of the Machinist & Traders' Insurance Company.

According to the testimony of Jess Fish, employee of I. Hassell, the owner of the New York Bargain House, Ashland, Ky., Fish, Cohen, and Bealman either in the spring or summer of 1926, "obtained two machine loads" of men's, and boys' clothing, sweaters, shirts, and ladies dresses and clothing at the Mullins store. These goods were hauled by Fish to Meyer Shoffman's store in Ashland, where they were boxed and shipped to Cohen, Pittsburg, Pa. J. B. Mullins claims these goods were the $300 worth of which he retained the ownership at the time he sold the Bear stock to W. J. and F. H. Mullins. There is a dispute as to the date Fish carried those goods from the store. It is only the fact that they were carried away and not on hand at the date of the fire

that is material. The Bear stock which was the Mullins stock was reduced by the value thereof.

About one week before the property was destroyed by fire, J. B. Mullins engaged Jessie Fielder, a young lady residing near the Mullins store, to conduct the business of the store, which she did during this week. Mrs. Myrtle Atkins, an aunt of Jessie Fielder, stayed in the store with Jessie during this week. Within a few days after the fire which destroyed the property, she and Jessie Fielder, from memory, made a list of the stock of merchandise, groceries, and fixtures on hand at the time of the fire, itemizing it and giving the value which aggregated $123. The list made by these witnesses and their testimony relating thereto was not objected to by the appellees, whereas those made by J. B. Mullinsand the testimony concerning same were objected to by the appellant. In making their list, Miss Fielder and Mrs. Atkins omitted to list the scales. In describing the women's shoes on hand, Mrs. Atkins stated, "there were some old-fashioned sharp toed shoes, old ladies comforts and some ladies slippers in stock, on the evening before the fire."

Jessie Fielder's testimony discloses that on the evening before the fire "there were no raincoats, no boys' suits, men's jackets, mackinaws, men suits, men's pants, khaki pants, boys' pants, ladies' suits, ladies' coats, and no shirts or overalls in the store of Mullins." Her testimony in this regard is corroborated by Mrs. Atkins and Mrs. Anderson.

J. B. Mullins produced on the trial an inventory amounting to $4,713.20 purporting to have been made April 5, 1926, the day he claimed he so sold the articles therein listed to W. J. Mullins and F. H. Mullins, also a list of the goods sold after April 5, 1926, totalling $1,099.13. The appellant's objections thereto were overruled, to which it excepted. Afterwards the court himself propounded to J. B. Mullins these questions, to which he made these answers, viz.:

"This inventory that you have presented here, was it made after the fire? A. Yes sir.

"Q. You had no records at that time to go by at all? A. No.

"Q. It was made altogether from memory? A. Yes sir."

D. H. Wade, over the objection of the appellant, was permitted to testify that he had "figured up" the statement (inventory) made by Mr. Mullins, invoicing the dry goods, shoes, etc., and that it totalled $3,635, or within $3.40 of it.

This inventory, as well as the statement of the list of the sales, was made from memory by J. B. Mullins. They contained many pages, on which is listed the names, the numbers, and description of the articles in stock, or sold, together with the cost price of those in stock and the sale price of those which were sold after he sold the stock to his sons. The context and volume of this inventory and list of sales portray the fact that J. B. Mullins has an agile mind and an amazing capacity to retain in mind, figures, not generally enjoyed by the merchants of the country, which enabled him to make them with an accuracy seldom equaled by experienced bookkeepers, with the record at hand. The inventory, the list of the sales, and the testimony of both Wade and J. B. Mullins concerning them were incompetent, and should not have been permitted over the objections of the appellant to be received by the jury.

Charles Jackson, a car repairer, was permitted to express the opinion that "Mullins had a pretty good stock," "the shelves were full of goods." These statements of this witness were merely his opinions without a statement of facts on which they were based.

C. J. Anderson, whose occupation was "running a locomotive," was permitted to express his opinion, without a statement of the facts on which it was founded, that "there was a general line of groceries, clothing, shoes, nice hats, some women's and boys' suits, and that there was no decrease in the stock from the time they moved there"; that the only thing he noticed was an "increase in the stock."

Noah Bartlett who was without occupation, testified that there was in the store "a general line of groceries, shoes, clothing, and women's furnishings"; that "the shelves were filled."

Arnold Neal, who at the time of the destruction of the stock by fire was sixteen years of age, testified that "there was a fair stock of groceries, shoes about $1,000.-00 and the clothing would go around $1,400.00 to $1,-600.00, and men's suits worth $1,500.00; that the stock had increased from the time the store was opened to the

796

time of the fire.'' This boy attended school and worked occasionally in the store on Saturday.

It is not shown that either of these witnesses was qualified to express an opinion as to the extent, quality, material, finish, style, original cost price, or the value of the stock of merchandise. Neither of them in any way had had experience in the mercantile business, except Mullins, and he only since he began to sell the Bear stock. Neither of them had any knowledge or information of the wholesale cost of such merchandise; nor had either of them an opportunity to acquire such knowledge or information.

J. B. Mullins, without any statement of fact as to the wholesale cost, or as to the quality, material, finish, or style of such merchandise, was permitted to fix its market value. He was permitted to say that the inventory presented by him was correct, and that it stated correctly the value of the merchandise, although his testimony showed that he had neither knowledge nor information of the wholesale cost of such merchandise previous to his purchase in bulk of the Bear stock. He, too, was without previous experience, and had had no opportunity to acquire knowledge of the original cost price of the character of merchandise covered by the inventory, having purchased only this stock, and was unable to remember the goods bought and added to the Bear stock. The lump sums which he had paid or received for the stock at the time he purchased or sold same shed no light on the question of the market value of the goods on hand at the time of the fire. Evidence thereof could only serve to confuse and mislead the jury.

It was competent for the appellant to inquire into the lump sums paid by J. B. Mullins for the merchandise as well as the sums which he had received therefor from his sons as bearing on the question of ownership, with proper admonition to the jury of the purpose for which it was admitted.

Mr. Wigmore on Evidence, vol. 1, sec. 478, p. 585, states the rule applicable to the testimony of appellee's witnesses in this language:

"When a witness' statement is offered as the basis of an evidential inference to the truth of his statement . . . it is plain at least three distinct elements are present: . . . First, the witness must know something, i. e., must have observed and received some impressions on the question. . . .

Secondly, the witness must have a recollection of these impressions, the result of his observation. . . . Thirdly, he must communicate this recollection to the tribunal; that is, there must be communication or narration or relation."

At section 651 this text-writer distinguishes between experience and knowledge of a witness in this language:

"Observation of the matters to be testified to is an essential conception in the qualifications of every eyewitness without exception. By observation is meant that direction of attention which is the source of impressions, and thus of knowledge. The distinction between experience and observation is that the former concerns the mental power or capacity to acquire knowledge on the subject of testimony, while the latter concerns the actual exercise of the faculties upon the subject of testimony. Competency as a witness is inconceivable without the presence of both these elements. The law of evidence must lay down some rules for the purpose of insuring an actual observation of and knowledge about the matter in hand."

In Warfield Natural Gas Co. v. Laferty, 232 Ky. 248, 22 S. W. (2d) 611, we said:

"We are committed to the rule that opinions as to values, without facts to support them, or based on facts that are more or less speculative or remote as well as somewhat fanciful, are of little value, and may be in a large measure ignored. Kentucky Hydro-Electric Co. v. Woodard, 216 Ky. 618, 287 S. W. 985 [City of Hazard v. Eversole, 237 Ky. 242, 35 S. W. (2d) 313]."

The opinions of the appellees' witnesses as to the extent or size of the stock of the men's, boys', and women's wearing apparel and furnishings, the quality, material, finish, and style, and the wholesale price or market value thereof, plainly fall within the inhibitions of these elementary rules.

It is a matter of general information that the value of merchandise, such as men's, women's and boys' wearing apparel, hats, and shoes, depends on the finish, material, and style, even when they are new, and only those

who have knowledge of the wholesale cost thereof, and who have had experience in like business, are qualified to express an opinion as to their market value. The opinions of witnesses who do not possess the essential qualifications to form an opinion as to their value are not only confusing but misleading. To permit a witness to state the number of pairs of shoes or the number of suits or ladies' dresses in stock affords but little light on the question of their actual cash value or fair cash value, in the absence of other evidence showing their original cost, and their quality, material, style and finish, and their stock or shelf-worn condition.

The appellees on another trial should be required to produce the best evidence as it is recognized by law in such cases, or show a reasonably diligent, faithful effort to do so, and, in case it is fairly and reasonably shown that such evidence is not obtainable, they may then be permitted to present such secondary evidence as the law requires in such cases, showing the wholesaler's or jobber's cost of like goods, and the quality, material, style, finish, and the stock or shelf-worn condition of the merchandise on hand at the date of the fire, as well as the quantity thereof.

As regards the instructions given by the court, No. 1 assumed that W. J. and F. H. Mullins were the owners of the merchandise and fixtures. While it is averred in their petition they were the owners of the property at the time of its destruction by fire, this was denied by the appellant in the amended answer. The rule is, if an insurance company seeks to avoid liability on its policy on the ground that the insured was not the owner of the property at the time the policy was issued or at the time it was destroyed, because of defects in his title the insurer should specify in particular the defects. If the company relies on the defense that the plaintiff has no title to the property, then the answer denying that the insured was the owner of it at the time of the issuance of the policy, or its destruction by the fire, is sufficient. If the company specifies particularly the defects of title, then the burden is on it to prove them. Sprigg v. American Central Life Ins. Co., 101 Ky. 185, 40 S. W. 575, 19 Ky. Law Rep. 363. The appellant having denied by appropriate pleading the averments of the ownership, the burden was on the appellees to prove their title at the time of its destruction. It is true that J. B. Mullins testified that the appellees were the sole owners of the prop-

·erty, yet there was evidence and strong corroborative ·circumstances tending to show the contrary.

The alleged possession of his youthful sons of such large sums of money on their persons, who were mere laborers in the mines, his receiving it, and neither applying it to the payment of his notes for the computing scales, nor the payment of the notes for the Bear stock ·of goods, without an explanation of his failure to deposit it in the bank or lodge it in some place of safety, his ·continued domination over the management and sale of the goods, with the power and right to control them, his living out of the store, without himself keeping an ac·count, after their alleged purchase, his retaining title to $300 worth of the stock without an inventory identification, or a separation of the goods retained from those ·claimed to have been sold by him to his sons, and their ·continuing to labor in the mines for wages, do not comport with the common experience of ordinary men.

It is not unfair to say that the claim of J. B. Mullins that his two sons owned the groceries and dry goods at the time of the fire, in the light of other irrefutable and inexplicable facts and circumstances, is not logically ·consistent with verity. The appellees did not themselves testify. No excuse or reason was shown accounting for their failure to appear and undergo the test of a diligent ·cross-examination. There was ample and potent evidence authorizing and justifying the jury to find that their ownership of the property was sworn to, but not proven. The story itself as told by J. B. Mullins carries with it more than one earmark of its own refutation, sufficient to challenge his credibility as a witness. On his own story, the jury might well afford to apply to it the maxim, "Falsus in una, falsus omnibus." Globe Indemnity Co. v. Daviess, 243 Ky. 356, 47 S. W. (2d) 990. Without restating the rule and the reasons therefor as stated in Globe Indemnity Co. v. Daviess, it cannot be doubted they are applicable to the facts proven in the present case.

The value of the property as fixed in the policy was no evidence of its value at the time it was destroyed by fire. It was therefore necessary for the insured to prove by competent evidence its value at that time. The general rule requiring the introduction of the best evidence applies to suits on insurance contracts, the meaning of which is that the best evidence obtainable by the exercise of reasonable diligence must be produced by an

insured. This includes duplicate bills of invoices of the goods made by the wholesaler or jobber at the time of. sale and shipment; inventories taken in good faith prior to the destruction of the goods and records of subsequent sales, and the other books and records made and kept in the usual course of business. If such records are lost or destroyed, the books of the bank where the money received from such sales was deposited are admissible to show the daily sales. Conn. Fire Ins. Co. v. Union Mercantile Co., 161 Ky. 718, 171 S. W. 407. The appellees offered no such evidence, and no reason is assigned explaining their failure so to do. It is not claimed that the merchandise other than the dry goods purchased from Bear was burned, except possibly one shipment; no explanation of the absence of the invoices to Bear of the wholesale houses from which Bear purchased them; no sort of an invoice of the groceries in stock other than one made from memory was offered as evidence; and no explanation of its absence was furnish to the jury. The rule requiring the best evidence, if obtainable, if not, secondary evidence, was disregarded utterly by appellees.

The policy contains what is commonly known as the "three-quarter" clause. Instruction No. 3 which fixed the measure of appellees recovery fails to recognize this clause of the policy. We find no statement in the record showing that this clause was not to apply in the event of the destruction of the property by fire. The instruction should recognize this clause, unless it has been waived by the company, in some manner.

The appellant offered instruction A, directing the jury to find for it if W. J. and F. H. Mullins were not the owners of the property, and, as we have indicated, the instruction embracing this theory should have been given to the jury.

Instruction C offered by the appellant was predicated on the clause of the policy which provides:

"In case of any fraud or false swearing by the insured touching any matter relating to the insurance of the subject thereof, whether before or after the loss, shall render it void."

A statement of the evidence as it has been hereinbefore given and paragraph 3 of the second amended answer authorized the giving of the instruction presenting to the jury the question of whether the insured had

committed any fraud or made any false statement in their proof of loss and the accompanying affidavit. Instruction C, offered by appellant presenting this defense, was incorrect, and the court properly refused to give it. While it is not the duty of the court in a civil case to give on his own motion the whole law of the case, but if an offered instruction is defective or incorrect, in form or substance, the court should prepare, or direct the preparation of, a proper one on the point attempted to be covered by the offered one. His failure to do so is reversible error. Louisville Cemetery Ass'n v. Downs, 241 Ky. 773, 45 S. W. (2d) 5, and cases cited. This rule made it the duty of the court to give to the jury the appellant's offered instruction, so written as to authorize it to consider the defense therein presented. The court in lieu of the offered instruction, on another trial, will instruct the jury as follows:

"Although you may believe from the evidence that the plaintiffs were the owners of the stock of merchandise and fixtures at the time of their destruction by fire, and that the defendant did or did not deny its liability under the policy sued on, yet, if you shall further believe from the evidence that the plaintiffs, W. J. and F. H. Mullins, in their proof of loss, or in their affidavit supplementary to their proof of loss, made a false statement as to the existence of a portion of the articles of merchandise in stock, or the value thereof, at the time of the fire, and that they, at the time they made such proof of loss, or affidavit, knew that such statement was false, or should have known it, then the law of the case is for the defendant and you should so find; but an innocent mistake or a reasonable overestimate of values will not have that effect and you should find that W. J. and F. H. Mullins were not guilty of false swearing as used in this instruction unless you believe from the evidence that they intentionally made said statement, knowing the same to be false, and for the purpose of procuring from the insurance company, money which they knew was in excess of the amount to which they were entitled."

Springfield Fire & Marine Ins. Co. v. Shapoff, 179 Ky. 804, 201 S. W. 1116; Security Ins. Co. v. Rosenberg, 227 Ky. 314, 12 S. W. (2d) 688.

To vitiate a fire insurance policy, statements under oath in proof of loss or the accompanying affidavit must be intentionally false and disclose a purpose fraudulently to overvalue or contain statements of items having no existence, and mere innocent mistake of the existence of items, or articles or exaggerated estimate of value, is insufficient. Western Assurance Co. v. Ray, 105 Ky. 523, 49 S. W. 326, 20 Ky. Law Rep. 1360; Conn. Fire Ins. Co. v. Union Mercantile Co., 161 Ky. 718, 171 S. W. 407; Hanover Fire Ins. Co. v. Coffman, 218 Ky. 568, 291 S. W. 725.

The court should define the term ''cash value'' as it is used in the policy by an instruction as follows:

''The term 'cash value' as used in the policy of the defendant means 'market value,' and 'market value' is such price, considering the original or wholesale cost price with freight added, and the quantity, quality, material, finish, style, and shelf-worn condition, if any, of the merchandise at the time of its destruction by fire, which it will bring when offered for sale by one who desires to sell, but is not compelled to do so, and is bought by one who desires to purchase but is not compelled to have it.''

The appellant's policy provides that

''the assured under this policy shall take an inventory of its stock and other personal property thereby insured at least once every twelve months during the terms of this policy and unless such inventory has been taken within one year prior to the date of this policy, one should be taken in detail within thirty days thereafter. (1) That the insured shall keep a set of books showing a complete record of the business transactions including all purchases and sales, both for cash and credit. (2) In case of loss assured should produce such books and last inventory.''

The inventory produced as part of the testimony of J. B. Mullins, dated April 5, 1926, purports to comply with this provision of the policy, but, as we have noted, on his examination by the court he stated it was made from memory after destruction by fire of the stock of goods and fixtures, and it cannot be considered as a compliance with this provision of the policy. The appellant

admitted the destruction of the stock of goods and fixtures covered by its policy, but denies its liability therefor. Under the familiar rule in such cases, the burden was on the insurer to allege and prove a violation of the quoted clause of this policy relating to inventories and the keeping of books. Colker v. Conn. Fire Ins. Co., 224 Ky. 837, 7 S. W. (2d) 502. In its answer as amended the appellant did not present as a defense the provisions of the policy and a breach thereof by the insured in this respect.

Finally, the appellant urges the provisions of its policy regarding the statute of limitation, fixed therein as of one year, and earnestly requests this court to review its former opinions, refusing to observe and enforce such contractual limitation. The court appreciates the candidness and fairness of counsel in his forceful argument. However, no new or additional reason has been presented by learned counsel warranting the court in overruling its former opinions on this question. A like provision in a contract abridging the period of limitation prescribed by statute was last reviewed by this court in Ætna Casualty & Surety Co. v. U. S. Gypsum Co., 239 Ky. 247, 39 S. W. (2d) 234, which may be considered now as finally stating the law of this state on this question. The parties should be permitted to amend their pleadings, if they desire.

Wherefore the judgment is reversed for proceedings consistent with this opinion.